Good morning, your honors, and may it please the court. I represent the plaintiff Tammie Christmas in this claim for Social Security disability benefits. The ALJ below found that she was incapable of performing her past work based on diabetes related impairments as well as other impairments including psychological impairments, but found that she was capable of performing one and only one job otherwise in the national economy. What is our standard of review in this case? Well, the standard of review is that it's de novo with respect to the legal principles, but that the fact finder gets the benefit of deciding the facts essentially. Does that answer your question, Judge? Isn't the standard the requirement that we have to review and the district court has to review the agency's decision and determine whether its conclusion as a whole was supported by substantial evidence in the record? That's exactly right. It's a reasonable person test or what a reasonable person would base the conclusion on. And we're arguing that there are three main reasons that reversal is warranted here. First, in formulating the RFC, Ms. Christmas' residual functional capacity, the ALJ improperly assessed her credibility. She was penalized for her inability to obtain proper medications. Didn't the ALJ point out in his opinion a number of portions of the record where she testified in ways that conflicted with the reports to medical professionals or was inconsistent with what had been said before? He did. Doesn't that go to credibility? It does, Your Honor. Isn't that something that the finder of fact can take into account? Absolutely, Your Honor, but going back to your question about the reasonableness and the substantial evidence part of it, those reasons have to still be supported by substantial evidence and be reasonable. What do you mean by substantial? If I say that, well, I heard him say it this way and in his report he said it a different way, is somebody going to say, well, no, that's not reasonable, you can't weigh those two different facts against somebody? I don't understand your point. Well, I guess the point is that the court is permitted to look at the facts and determine whether or not those reasons were in fact based on substantial evidence, whether they were reasonable or not. Can we judge the credibility of the witnesses? No, Your Honor, I don't think that the court here is required to judge the credibility. It's only to determine whether the judges, the ALJ's assessment was based on reasonable factors articulated in the decision. Why couldn't the ALJ on this record come up with a negative credibility determination? Wasn't there a sufficient basis for him to do it? Our argument is no, Your Honor. Well, let me cite you to two things. Yes, sir. And tell me why they would not provide a sufficient foundation for the ALJ to say, I reject her credibility. Regarding noncompliance with the treatment, that was a big issue. The ALJ said that Ms. Christmas testified during the first hearing that she always takes her medicine for diabetes. But he said the records, particularly those submitted between the first and the second hearing, rebut the claim and show substantial repeated noncompliance with the treatment. And while financial difficulty might be an explanation for it, it didn't explain the inconsistencies at the hearing regarding her compliance and the objective medical evidence that showed repeated noncompliance. Could not the ALJ have seized upon that, which he obviously did, and say here is one clear and specific and important instance where her credibility really was undermined? Yes, Your Honor. I think there are two reasons, two things I would like to address about that, if I may. Sure. Number one, the reference that the ALJ made with respect to always taking the medications, it was in response to her attorney's, the claimant's attorney's question at the hearing, at the first hearing. And when she was asked, well, do you always take your medications? The answer was like an uh-huh. And it was a very vague reference. But the point is that that is something that it's really unclear whether or not she was trying to purposely mislead the court. In fact, it clearly wasn't, if you look at that, because there's not a single one. So you're saying the conflict wasn't clear enough from the record to support the finding? It absolutely wasn't, Your Honor. And if you look, it's a very vague reference. And there's no other treatment provider that even remotely indicates that she was doing it intentionally or trying to mislead. Well, what about the fact that she told the providers that she didn't use tobacco, but then told the consultative physician that she's been chewing tobacco since age seven? Is that not true or false or in between? It's actually incorrect. And I think if the record ferrets this out, first of all, I believe the commissioner argued that she indicated that she didn't use tobacco or told the providers that she never used tobacco. It's consistently in the record. There's maybe one single record. It might have been when she started treating later in the relevant period. It's beginning in 2011. But there's a record in 2013. It's one. Maybe it might have been the very first visit at the clinic where she treated the Lee Physicians Group, where they indicated tobacco use, none. But if you look at all of the rest of the records there, they all indicate she doesn't smoke, but she uses snuff is what they indicate. And that's in every single one of the records. And that's consistent. Were there other inconsistencies, though? For example, I thought she claimed that she had agoraphobia, couldn't really be around people much, but yet she went to church. Essentially, she was claiming, I basically can't get out of bed every day. I just can't do anything. Yet she also admitted to cooking and doing other things like that. Well, that's what the ALJ did, kind of picking shoes out of the record. But if you look at those same records, they all have kind of a qualifying explanation about it. And that's one of the second part of the argument I wanted to address with Judge Marcus, too, is that whether or not the judge used enough out of the record to attack her credibility, it still has to be specifically articulated throughout the decision. And the law does not permit a judge to just pick and choose out of the evidence to the exclusion of evidence that actually supports the claim. So, and along those lines, I did want to make... But on that point, the ALJ said, among other things, that the claimant's activities have at times been greater than what she generally reported. And the record shows that she told Dr. Musavi she was able to cook and clean. But in her function report and at the hearing, she said she was unable to do household chores and that her children did them for her. Again, there may have been references that, on the surface, appear to kind of contradict each other. But if you look at those same records that were used in the decision, those records, again, they qualify each statement. And yes, I cook, or yes, I do laundry, but then it's usually followed by a statement about, well, my kids do all of that. I live with them. As far as to the question Judge Cardin had about the agoraphobia and not being able to go out, well, that's exactly one of the reasons why I think this court should reverse in this case. Because the judge, the ALJ at the hearing, he really was making a credibility assessment on this particular issue. He kind of made a mental health assessment of his own. That was really the main part of the sit and squirm jurisprudence that he engaged in, just using his own lay observations. But by her own inconsistent account, she had admitted that, in fact, she did go out and mingle in the public, correct? Well, it actually, I believe, supports the claim, too. She does go places, but if you look at the record, it's occasionally she generally avoids trying to do those things. And this is one of those times. And by allowing the ALJ to conduct this kind of sit and squirm analysis, it really discourages claimants from, well, first of all, it encourages them to feign or exaggerate symptoms at a hearing. But even worse, it may discourage them from even attending a hearing out of fear that they don't look disabled. And in certain cases, the courts have recognized that an ALJ's observations at those hearings, they're something that can be utilized. But this is different. This judge made a very specific factual finding about the mental impairments. And for that reason, we believe that a decision to advise the judges, the ALJs about that is necessary here. I see I'm out of time. Thank you very much. Thank you, Your Honor. Thank you. Good morning. Morning. May it please the Court. Richard Winters for the Commissioner. This Court can affirm the ALJ's RFC accountability determinations because they are amply supported by the record. When the ALJ noted that Klayman had a history of uncontrolled diabetes due to noncompliance with treatment, he had more in mind than just diabetic medication. He emphasized that Klayman's medical providers repeatedly and strongly recommended the no-cost measures of improving her diet, exercising, and further controlling her weight. And Klayman failed to provide evidence that she followed those recommendations. Indeed, she admitted to one of her doctors, Dr. Tabra, that she did not follow a good diabetic diet and that her blood sugars were up and down dramatically. And she also admitted to her doctor that she did not exercise. The ALJ's subjective symptom evaluation or credibility determination should be upheld because he gave several additional reasons, including the objective medical evidence, Klayman's history of inconsistent statements, and her activities of daily living. As this Court noted in Mitchell, subjective complaint findings are the province of the ALJ and this Court will not disturb a clearly articulated finding supported by substantial evidence. This Court can also affirm the ALJ's Step 5 determination that there was other work that Klayman could perform given her limitations and vocational profile. Under the regulations, the Commissioner at Step 5 is required to come forward with a significant number of jobs in one or more occupations, which is what the Commissioner did in this case. Consistent with the regulations, this Court has concluded, this was in Allen on page 27 of our brief, that one occupation is enough. One occupation with a significant number of jobs in the national economy is sufficient to support an ALJ Step 5 determination. Well, Counsel, in that regard, under Washington, wasn't there an apparent conflict between the expert and the DOT? And the ALJ said he was relying on the vocational expert's experience. Now, is that a sufficient evidentiary predicate? Well, I would say that with respect to the two limitations at issue, tandem and teamwork, occasional tandem teamwork, and the production and pace limitation, that the ALJ fulfilled his duties under SSR 004-P to identify apparent conflicts and resolve them by presiding over a hearing where the ALJ and the plaintiff's attorney asked probing questions of the V.E. about each of those limitations and whether or not they were precluded by the DOT's description of the job. And in both cases, the V.E. said no. And if I could turn first to the occasional team and tandem work, the V.E. accurately described the job. It's 10 conveyors to distribute citrus fruits to packers at workstations. Patrol the catwalks beside the conveyors. You monitor the flow and as necessary, you reroute the fruit to maintain adequate supply to each packer. Now, the DOT job description does not specifically address team or tandem work. So it would be reasonable, I suggest, to say that it does not seem apparent that there's any inconsistency between the limitation to occasional or tandem work. Well, is there anything in the record that supports that argument? The record supports the argument that it was team and tandem? I'm sorry? I'm sorry. Are you suggesting that the record supports that the job of fruit distributor requires team and tandem work? Team work and the ability to control the flow and that would suggest speed. Right. And this woman didn't appear to be able to do something like that, I believe the argument goes. But so the ALJ says, well, I'm just relying on the expert's experience. Well, no, he relied on more than experience. In fact, the claimant's attorney at the hearing suggested to the V.E. that the job entails tandem and team work and this is what the V.E. said quite emphatically. No, I don't think they do any job tasks requiring teamwork or working with other individuals. It's got to require teamwork. If you're directing flows to keep Packer A filled with fruit and then Packer B and you're moving things back and forth, it's got to take teamwork. In a general sense, Your Honor, yes, the whole facility, all the workers are involved as a team, but the job of fruit distributor does not require the person to actually directly connect with another person in terms of accomplishing a task. What would happen if one person just didn't get anything because she said, I just didn't look over there? Well, then the fruit distributor failed to do her job. Is that a job requirement? Well, it's a job requirement, but it's not the accomplishing the task of monitoring the flow of fruit does not involve being with any other person. That's a job done by the single person. So in that sense, it's not team. It's also not tandem because the dictionary definition of tandem is that when something is done in tandem with another person, the two people are doing it together. They're working together, as in, for example, some fast food jobs. And not only did the V.E. and he's an expert, and the ALJ has the right to rely on the expert testimony of the V.E. if it's reasonable, not only did the V.E. say, no, I don't think any of the tasks of fruit distributor involve teamwork, that is, they're not really working as a team with the packers. Yes, they're part of a group that's accomplishing this task, but upon further questioning, the V.E. stated that he did not see any language in the DOT that would indicate team or tandem work was involved in the position. Simply put, tending conveyors to distribute citrus fruit to packers' workstations does not require that the person directly work with the other workers. And contrary to Clement's suggestion in her brief, the DOT job description does not indicate that there's even frequent communication between the fruit distributor and the packers. In fact, the position in the DOT, the DOT description of the position says that no talking is required to do the job. There is thus ample support in the record upon which this court can conclude that the ALJ fulfilled his duty under SSR 004P despite not having discussed and resolved the apparent conflict in the decision. And I would say that if the ALJ erred in any respect when it comes to SSR 004P, it's only an articulation failure. He resolved the conflict, he identified the conflict at the hearing, got a satisfactory, reasonable explanation from the V.E., and thus he could proceed by relying on the V.E.'s testimony. Now, the ALJ should have, in his decision, articulated that, identified the conflict, and explained how he resolved it. But this case is on four squares which is a recent post-Washington decision of this court that was the subject of the Commissioner's second letter of supplemental authority. In that case, the claimant was limited to occasional interaction with the general public. But the V.E. said that the person could do a job called the sales attendant job, but if you look it up in the DOT, it says that that job requires significant serving of people. Thus, there's an apparent conflict. And the ALJ did not expressly discuss the conflict, acknowledge the conflict, resolve the conflict in the decision. But this court held, unlike in Washington, that the failure to do so was harmless because the record shows that there was a colloquy with the second V.E. which shows that the ALJ acknowledged the conflict and resolved it by asking the V.E. pointed questions to clarify the level of public interactions required of the sales attendant position. And it turns out that the sales attendant position was the person who would go into changing rooms and pick up clothes that had not been purchased or might direct a customer to a certain area of the store but they did not have direct communication with the customer as behind a cashier, for example. And the court said in Zaslo, because there was ample support in the record upon which this court could conclude that the ALJ complied with his duties, the decision could be affirmed. Likewise, in this case, the V.E. clarified the extent of co-worker interaction required of the food distributor position and stated and the V.E. stated that he did not see any language in the D.O.T. that would indicate team or tandem work. The ALJ thus can rely on that expert testimony. If I can now turn, Your Honors, to the limitation to no high-volume production quotas or fast-paced assembly line work. In response to the ALJ's inquiry, and again, the ALJ, we know he took his duty seriously because at the very first page of the decision, he states that he has a duty to identify  And at the hearing, he asked the V.E. about production and pace requirements. And the V.E. said the D.O.T. does not address production and pace requirements. And because, we submit, because the D.O.T. is silent as to production and pace requirements, there can be no apparent conflict between V.E. testimony and the D.O.T. Courts, other courts, have held that if the D.O.T. does not address a particular subject, there can't be an apparent conflict. For example, the Seventh Circuit concluded that because the D.O.T. does not address sit-stand options, it is not apparent that the V.E.'s testimony could conflict with the D.O.T. That's a case that's noted on page 41 of our brief. Now, to the extent that there was an apparent conflict, the record shows that the A.L.J., in his colloquy with the V.E., resolved it by asking the V.E. to clarify the production and pace requirements of the job. And the V.E. said that this was an unskilled job and unskilled occupations typically do not involve paying the employee by piece rate or on the amount of production. Therefore, the Court could conclude that the A.L.J. resolved any conflict between no high-paced production and this job because he identified the conflict at the hearing and he resolved it. So this Court can be confident that he fulfilled his duties despite the fact that he did not expressly discuss it in his opinion. I'd like to now turn to one occupation. Is one occupation enough? In this case, it is true that the V.E. identified only one occupation, but the regulations state one occupation is enough. Work exists in the national economy when there's a significant number of jobs in one or more occupations. This Court has concluded that one occupation with a significant number of jobs in the national economy constitutes substantial evidence. Now, the V.E. in this case testified that there were 40,000 of these food distributor jobs available in the national economy, which is a significant number. In an unpublished decision of this Court, cited at page 27 of our brief, this Court concluded that 23,800 jobs in the national economy was a significant number. I'd like to say a word about demeanor if I could. The ALJ gave many reasons to support his credibility, determination, and one factor he did take into account, which this Court in Norris said is permissible, he noted personal observations of the claimant. And he did so in the context of assessing her ability to social functioning. And in doing so, he did not engage in sit-and-squirm jurisprudence. This Court explained in Freeman that the sit-and-squirm test involves an ALJ subjectively coming up with his or her own index of traits for what a disabled person with these certain conditions should look like. And when they don't look like that at the hearing, they say, well, they're not disabled. That didn't happen here. The ALJ simply noted in response to her allegations of not being able to be around people at all that she was able to sit at the hearing with no difficulty and that was in the same sentence where she said that she went to church, she was out in the community, she went shopping with her daughter, and that kind of thing. Are there any further questions before I give my final statement? Thanks very much. The ALJ decision in this case should receive deference because his careful and thorough evaluation of the evidence shows that he followed the regulations in reaching his factual findings. Moreover, the threshold for evidentiary sufficiency in social security cases is not high. Substantial evidence exists in the record to support the ALJ's factual findings and therefore this Court should affirm the judgment below. Thanks very much. Thank you, Your Honors. Just to briefly address Mr. Winter's argument about the credibility or the noncompliance issue with respect to the education and the diet, whether she failed to follow the diet. There is, again, this time period from 2011 basically through 2015 and she was provided with some education resources that were handouts mostly, if you can look at the record. But I think the pertinent issue is whether there's evidence that that would in fact restore the claimant's ability to work and that's the operative inquiry and there's nothing in there to suggest that nothing in the record to suggest that it would restore her ability to work. Maybe it would help her health, that's another question, but the ALJ did not develop that adequately. The next thing with the Commissioner's reading of Washington, the thing about the and it required that the ALJ specifically and clearly articulate the reasons why or how the conflict was resolved. Here, I mean, if you look at the plain language as Judge Kelly was pointing out, it not only talks about the primary duties that someone's regulating the flow of work, it also specifically indicates that it's regulated by the packing speed of each worker it specifically addresses that. So, I mean, arguably this conflict is much more apparent than it was in Washington. If you look at those two documents right next to each other the conflict really just jumps off the page. And same thing with the use of the hands. The definition or the description of the DOT specifically talks about repeatedly turning a wing nut and loosing a conveyor rail and other things that were essentially precluded by the RFC but, again, the ALJ really did not specifically identify all of these conflicts and resolve them in the decision. Lastly, with respect to Mr. Winter's discussion about the sit and squirm and the jurisprudence that was conducted here and the ALJ's observations they were specifically based on the mental issues and in his decision he relied on his very own lay observations to reject her credibility that he rejected the psychological examiners with respect to observations that she had made that was in one of the psychological reports. I see my time is out. Thank you. This court will be in recess until 9 a.m. tomorrow morning.